## APPEALS OF NAPOLEON B. BURGE AND C. B. BURGE.

Docket Nos. 2611, 2762.    Decided August 4, 1926.

The transfer by tenants in common of their undivided 'interests in a number of oil leases to a corporation in exchange for the capital stock of that corporation resulted in taxable income under section 202 of the Revenue Act of 1918.

*F. A. McCoy, C. P. A.*, for the petitioners.
*Arthur J. Seaton, Esq.*, for the Commissioner.
*D. R. Hite, Esq.*, as *amicus curiae.*

Before Arundell, Lansdon, and Sternhagen.

These are appeals from determinations of deficiencies in income tax for the calendar year 1919 as follows:

Napoleon B. Burge _____ $20, 462. 97
C. B. Burge _____ 1, 460. 73

The only question involved is whether the taxpayers realized taxable income in the transfer of their undivided interests in a number of oil leases to a corporation, receiving in exchange therefor capital stock of the corporation. The facts in the two appeals are identical, with the exception of the size of the interests transferred and the number of shares of capital stock received in exchange. Written stipulations of facts were filed, from which we have made our

### FINDINGS OF FACT.

Prior to November 14, 1918, but subsequent to March 1, 1913, certain oil leases were owned by the following persons and corporations in the following proportions:

F. E. Rose _____ Undivided one-fourth
S. W. Forrester _____ Undivided one-fourth
Elmhurst Investment Co., a corporation ____ Undivided one-half.

On November 14, 1918, F. E. Rose assigned and transferred his one-fourth interest to the Prudential Trust Co. of Topeka, Kansas, trustee, to be held in trust. On December 9, 1918, S. W. Forrester assigned and transferred his one-fourth interest to the same trustee and for the same purpose.

On December 9, 1918, S. W. Forrester, C. W. Horn, N. B. Burge, C. B. Burge, and C. A. O'Meara notified the said Trust Company, trustee, that they were the owners of the undivided one-half interest in the following proportions:

S. W. Forrester _____ 29/96ths
C. W. Horn _____ 12/96ths
N. B. Burge _____ 5/96ths
C. B. Burge _____ 1/96th
C. A. O'Meara _____ 1/96th

The remaining 48/96ths undivided interest was owned by the Elmhurst Investment Co.

While these leases were held in common, and on September 1, 1918, Well No. 1 on the Joliffe lease was drilled in dry and was finally abandoned as a dry hole.

On February 4, 1919, while the leases were still held in common, Well No. 1 on the West Gillette lease was brought in with a flush production of 1,200 barrels.

On March 31, 1919, the tenants in common last above referred to entered into the following contract:

Proposal for the Organization of The Elmhurst Petroleum Company (or such other name as may be agreed upon.)

We, the undersigned, are the owners of the oil and gas leases hereinafter mentioned, in the following proportions:

| | |
|---|---|
| The Elmhurst Investment Co | 48/96 |
| S. W. Forrester | 29/96 |
| C. W. Horn | 12/96 |
| N. B. Burge | 5/96 |
| C. A. O'Meara | 1/96 |
| C. B. Burge | 1/96 |

It has been found to be extremely awkward and inconvenient to make contracts or to do business with reference to the development and operation of said properties under such diverse ownership of the same. It is therefore agreed by and between said owners that for the purpose of placing the title to said leases under a single ownership, and for greater convenience in making contracts and doing business, that a corporation be created for the purpose of taking the title to said properties, holding and developing the same, and disposing of the products therefrom, all in the interest of the present owners thereof.

We, the undersigned, hereby agree to incorporate a company under the laws of the State of Kansas, to be known as The Elmhurst Petroleum Company (or such other name as may be agreed upon at the time), said company to have a capital stock of five million dollars ($5,000,000), divided into fifty thousand (50,000) shares of One Hundred Dollars ($100) each.

After the above named company has been organized we will each convey to it our respective interests in said oil and gas leases being the following leases on lands situate in Township Twenty-two (22), Range Four (4), East, Marion County, Kansas.

[Here follows a detailed description of the leases involved.]

Amounting in all to twelve hundred acres.

It is further agreed by and between ourselves that stock shall be issued to us for the purpose of representing our respective interests in said property, in exact proportion thereto, and in amounts as follows:

| | | |
|---|---|---|
| Elmhurst Investment Co | 23,040 | shares |
| S. W. Forrester | 13,920 | shares |
| C. W. Horn | 5,760 | shares |
| N. B. Burge | 2,400 | shares |
| C. A. O'Meara | 480 | shares |
| N. B. Burge | 480 | shares |
| Total | 46,080 | shares |

The number of shares which will remain undisposed of will be about 3,920.

Directors and officers of said company shall be chosen as agreed upon among ourselves and any directors selected from outside our number shall be chosen with the understanding that they are to represent us.

We further agree that any moneys required for the development of these properties shall be furnished by us in proportion to our respective interests therein. For the purpose of protecting the credit of said company, shares of stock may be issued to cover the amounts so furnished in lieu of the issuance

of obligations of the corporation if such plan is thought best. Under no circumstances will the corporation sell any of its stock to anyone other than the parties hereto.

Witness our hands at Topeka, Kansas, March 31, 1919.

THE ELMHURST INVESTMENT COMPANY.

(signed)    By N. B. BURGE, *President.*

N. B. BURGE.

C. A. O'MEARA.

C. W. HORN.

C. B. BURGE.

[SEAL.]    S. W. FORRESTER.

In carrying out the contract of March 31, 1919, on April 15, 1919, the Orlando Petroleum Co. was incorporated under the laws of Kansas, with its principal office and place of business at Topeka, Kans., with an authorized capital stock of 50,000 shares of the par value of $100 each. The oil leases described in the foregoing contract of March 31, 1919, were assigned to the Orlando Petroleum Co., with the exception of one of the leases listed in the contract and known as the Holman lease. This lease had been sold to one De Golia, for $60,000, and the claim against De Golia in this amount was assigned to the Orlando Petroleum Co. and afterwards collected by it.

Pursuant to the contract of March 31, 1919, upon the request of S. W. Forrester, C. W. Horn, Napoleon B. Burge, C. B. Burge, and C. A. O'Meara, the beneficiaries under the aforementioned declaration of trust, the Prudential Trust Co., on April 15, 1919, executed to the Orlando Petroleum Co. an assignment of the respective interests of the beneficiaries in the oil leases heretofore mentioned. On the same day the Elmhurst Investment Co. executed to the Orlando Petroleum Co. an assignment of the remaining undivided interest in the leases.

The cost of all the property of every description transferred to the Orlando Petroleum Co. by the parties to the above mentioned contract of March 31, 1919, was $105,423.21.

The proportion of the above cost of $105,423.21 attributable to the taxpayer, Napoleon B. Burge, is 5/96ths of $105,423.21, or $5,490.74, instead of $1,476.26 used in the Commissioner's deficiency letter, and the portion attributable to the taxpayer, C. B. Burge, is 1/96th of $105,923.21, or $1,098.15, instead of $295.25 used in the Commissioner's deficiency letter.

The fair market value of all the property of every description transferred to the Orlando Petroleum Co. by the parties to the aforementioned contract of March 31, 1919, at the time of the transfer on April 15, 1919, was $1,096,339.87.

The proportion of the above fair market value of $1,096,339.87 attributable to the taxpayer, Napoleon B. Burge, is 5/96ths of

$1,096,339.87, or $57,101.03, instead of $55,291.20 used in the Commissioner's deficiency letter; and the proportion attributable to the taxpayer, C. B. Burge, is 1/96th of $1,096,339.87, or $11,420.21, instead of $11,058.24 used in the Commissioner's deficiency letter.

The Commissioner, therefore, concedes that the profit attributable to the taxpayer, Napoleon B. Burge, as a result of transferring his interest in the aforementioned assets to the corporation (The Orlando Petroleum Co.) is $51,610.29, instead of $53,814.94 as used in the deficiency letter; and the profit on the transfer attributable to the taxpayer, C. B. Burge, is $10,322.05, instead of $10,762.99 as used in the deficiency letter.

At a meeting of the stockholders of the Orlando Petroleum Co. on April 15, 1919, a resolution was adopted reciting and accepting the proposal to transfer the leases in consideration of the execution, issue and delivery of certificates of the capital stock of this company to the amount of 46,080 shares, to be issued to said parties in proportion to their respective ownerships in said leases, as follows, to wit:

|  | Shares. |
|---|---|
| Elmhurst Investment Co | 23,040 |
| S. W. Forrester | 13,920 |
| C. W. Horn | 5,760 |
| N. B. Burge | 2,400 |
| C. A. O'Meara | 480 |
| C. B. Burge | 480 |

The resolution further provided:

The transfer of the above and foregoing leases to include the transfer of the drilling rigs, casing, tools, and all other personal property now on said leases, or used in connection therewith, or belonging thereto owned by the Elmhurst Investment Company and the Prudential Trust Company, or either of them, and also the office furniture and fixtures heretofore used and now owned by said parties in their offices at Peabody, Kansas.

The transaction was completed and the stock issued in the proportions stated above.

Prior to the transfer of the leases and personal property appertaining thereto, the Orlando Petroleum Co. had no assets of any kind whatever.

Immediately after the transfer of the leases and personal property appertaining thereto to the Orlando Petroleum Co., the only assets possessed by that company were the leases and personal property so transferred, having a value of $1,096,339.87, as above set forth.

The stock of the Orlando Petroleum Co. issued to the tenants in common, namely, the Elmhurst Investment Co., S. W. Forrester, C. W. Horn, Napoleon B. Burge, C. B. Burge, and C. A. O'Meara, was in exact proportion to the undivided interest of each in the

oil leases and personal property transferred to the Orlando Petroleum Co.

After the transfer of the leases and personal property to the Orlando Petroleum Co., the tenants in common of the leases were in absolute control of the Orlando Petroleum Co. and owned all the issued capital stock thereof.

OPINION.

ARUNDELL: If there are deficiencies in these appeals they arise from sections 213 and 202 of the Revenue Act of 1918. Section 213 provides, in part:

The term " gross income "—

(a) Includes gains, profits, and income derived from * * * sales, or dealings in property, whether real or personal.

The pertinent portion of section 202 provides:

(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any, * * *.

Briefly stated, the facts in these appeals are that sometime subsequent to March 1, 1913, these individual taxpayers and others not here involved acquired undivided interests in certain oil leases and equipment at a cost, to all the tenants in common, of $105,423.21. On April 15, 1919, the fair market value of these leases and equipment was $1,096,339.87. On the latter date the leases and equipment were transferred to a corporation organized by the tenants in common, who received in exchange, in proportion to their interests in the leases, capital stock of the corporation of a par value of $4,608,000, of a total authorized capital stock of $5,000,000.

The taxpayers contend that they realized no taxable gain upon the transfer to the corporation of their undivided interests in the leases in exchange for capital stock of the corporation, the transfer being such as affected the form of ownership only and was not one of substance.

To support their contention they cite and place their principal reliance on the decision in the case of *Weiss* v. *Stearn*, 265 U. S. 242; 44 Sup. Ct. 490; 4 Am. Fed. Tax Rep. 3986.

The Commissioner contends *Weiss* v. *Stearn* is not in point, and to support his views cites *Marr* v. *United States*, 268 U. S. 536; 45 Sup. Ct. 575; 5 Am. Fed. Tax Rep. 5393, and the decisions of this Board in *Appeals of E. C. Huffman*, 1 B. T. A. 52; *J. K. Greenwood*, 1 B. T. A. 291; *D. F. Buchmiller*, 1 B. T. A. 380; *S. B. Quigley*, 2 B. T. A. 159; *G. Shapiro*, 2 B. T. A. 620, and *E. E. Davis*, 2 B. T. A. 841.

In *Weiss* v. *Stearn*, *supra*, which involved the transfer of stock of an old corporation to one newly formed, it was held that stock-

holders of the old company realized no taxable gain in the receipt of stock of the new company. This case is explained in *Marr* v. *United States*, 268 U. S. 536, at p. 541, as follows:

* * * In *Weiss* v. *Stearn* a new corporation had, in fact, been organized to take over the assets and business of the old. Technically there was a new entity; but the corporate identity was deemed to have been substantially maintained because the new corporation was organized under the laws of the same State, with presumably the same powers as the old. There was also no change in the character of securities issued. By reason of these facts, the proportional interest of the stockholder after the distribution of the new securities was deemed to be exactly the same as if the par value of the stock in the old corporation had been reduced, and five shares of reduced par value stock had been issued in place of every two shares of the old stock. Thus, in *Weiss* v. *Stearn*, as in *Eisner* v. *Macomber*, the transaction was considered, in essence, an exchange of certificates representing the same interest, not an exchange of interests.

Continuing in the *Marr* case, the court says:

In the case at bar, the new corporation is essentially different from the old. A corporation organized under the laws of Delaware does not have the same rights and powers as one organized under the laws of New Jersey. Because of these inherent differences in rights and powers, both the preferred and the common stock of the old corporation is an essentially different thing from stock of the same general kind in the new. But there are also adventitious differences, substantial in character. A 6 per cent. non-voting preferred stock is an essentially different thing from a 7 per cent. voting preferred stock. * * * The case at bar is not one in which after the distribution the stockholders have the same proportional interest of the same kind in essentially the same corporation.

The taxpayers here say that by the exchange of leases for stock none of the stockholders gained anything really different from what they had had prior to the exchange; that the appreciation in value of the property before the transfer was evidenced by instruments of writing showing undivided interests in the oil leases and after the transfer this appreciation was evidenced by certificates of stock reflecting identically the same undivided interests, owned by the same persons.

There might be some grounds for saying that the stock certificates held by the stockholders represent the same *amount* of interest in the leases as they had owned before the transfer, but to say that they represent the "same undivided interests" is not accurate nor in accordance with the settled law. Prior to the exchange the taxpayers held title to their interests in the leases with all the incidents of complete ownership; after the exchange the corporation had title, legal and equitable, to the whole property. *Eisner* v. *Macomber*, 252 U. S. 189, 208.

The taxpayers further urge that the change of ownership of the leases was a change in form and not in substance; the tenants in

common created the corporation to serve them, controlled the corporation entirely, and in substance had nothing more than they had before the transfer. We think it immaterial that the former tenants in common controlled the corporation, as the fact remains that they and the corporation were separate entities. This fact is one that can not be ignored and the distinction between a corporation and its stockholders for income tax purposes is a legal distinction of substance and not merely of form. *Eisner* v. *Macomber*, 252 U. S. 189, 214; *Cullinan* v. *Walker*, 262 U. S. 134. And whether the stockholders had anything *more* after receiving the corporate stock than they had before is not the test. *United States* v. *Phellis*, 257 U. S. 156, 171; *Rockefeller* v. *United States*, 257 U. S. 176, 183. The true test is laid down in *Weiss* v. *Stearn*, 265 U. S. 242, where the court says, at page 254, that, if a stockholder is to be taxed on an exchange of property the transaction must be "something which gives the stockholder something really different from what he theretofore had." This test, when applied here, gives the real solution to the question. The taxpayers, prior to the exchange, had the direct ownership, hence complete and full control, over their interests in the leases; after the exchange they were at most beneficial owners of the assets of the corporation, their shares therein being evidenced by stock certificates which carried with them no direct right of ownership in the assets. *Appeal of E. C. Huffman*, 1 B. T. A. 52, and cases therein cited. In other words, by this transaction the taxpayers received shares of stock which were property of a distinctly different kind from, and having entirely different attributes than, the property paid in by them.

Referring again to *Weiss* v. *Stearn*, we find in that case that, while technically a new entity was created in organizing a new company, the *corporate* identity of the old was deemed to have been substantially maintained because the new corporation was organized under the laws of the same State, with presumably the same powers as the old. *Marr* v. *United States*, 268 U. S. 536, 541. In a brief filed by *amicus curiae* it is pointed out that the owners of the oil leases were residents of Kansas and that the corporation was organized under the laws of that State; that the corporation had no greater power in disposing of the oil than the owners, in the aggregate, had of disposing of the same oil. These statements overlook the fact that the *Weiss* v. *Stearn* decision was based, in part, on the substantial *maintenance or continuance of the corporate identity*, whereas in these appeals there is a complete change of identity—a change from ownership by individuals to corporate ownership. While the power of the corporation to dispose of the oil was per-

haps no greater than that of the tenants in common, it will not be seriously contended that the powers of a corporation and of an individual, generally, are the same. If a comparison of powers is to be made it must be of powers generally, and not of any particular power.

It is also contended that for a tax to result under section 202 from an exchange of property requires two distinct things as property, and that, until a new corporation has issued its stock, it has no property; that property received in exchange, if a taxable gain is to result, must have a value inherent in itself prior to the exchange.

These contentions overlook the fact that the capital stock of a corporation is in itself property. *De Ganay v. Lederer,* 250 U. S. 376. In *Merchants Loan & Trust Co. v. Smietanka,* 255 U. S. 509; 3 Am. Fed. Tax Rep. 3102, which involved the taxability of gain on the sale of capital stock, it is said:

> Plainly the gain we are considering was derived from the sale of personal property * * *.

The method of determining the value of stock issued in exchange for property has been considered by the Board in *Appeal of William Ziegler, Jr.,* 1 B. T. A. 186, 192, where we held:

> The usual method of appraising stock issued for property where there is no evidence of the market value of the stock is to say that the stock is deemed equivalent in value to the property for which it was issued, and by determining the value of the property one can determine the value of the stock.

In the present appeals the fair market value of the property transferred to the corporation is stipulated to be $1,096,339.87. Applying the rule laid down in the *Ziegler* appeal, the fair market value of the stock of the Orlando Petroleum Co. is the same amount. This is the figure used by the Commissioner and the taxpayers have offered no proof that the fair market value of the stock was in a different amount than that here found.

We conclude that the taxable profit realized in these cases is the difference between the cost of the property to the taxpayers and the value of the corporate stock received in exchange therefor. In the case of Napoleon B. Burge the taxable profit is the difference between $5,490.74 and $57,101.03, or $51,610.29. In the case of C. B. Burge the amount of taxable gain realized is the difference between $1,098.15 and $11,420.21, or $10,322.06.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*