*47 OPINION.
Geeen:
These proceedings were brought by the executors of Karl von Ruck for a redetermination of the decedent’s income taxes for the calendar years 1919, 1920, and 1921, and also for a redeter-mination of the estate tax.
The decedent was a cultured German physician, who for a great number of years resided at Asheville, hi. C., where he had established a tubercular sanatorium. He appears to have been an extremely dominating character, endowed with unusual business ability, who surrounded himself with relatives who, with the exception of his son, were never allowed to assume any position of real authority in his various business ventures. For some time prior to 1918 he had been retired from active practice of his profession and had leased his sanatorium to his son, Dr. Silvio von Ruck, who continued its operation until the time of his death in 1918. Almost simultaneously with the death of his son was the death of the son’s daughter, leaving the decedent with no direct heirs. Upon the death of the son, the decedent again resumed his professional activities and was so engaged until the time of his death.
Nine issues were raised by the pleadings in the proceedings. The consolidated opinion will follow the same order in which we have found the facts.
*48 (1) The respondent contends that the decedent realized a taxable gain of $140,619.25 from the sale of certain real estate to the Spray Cotton Mills on July 1, 1919. The petitioners contend (a) that the stock received by the decedent had no fair market value; (b) that the stock received did not have a fair market value in excess of-$56 per share; and (c) that the transfer of property by an individual to a corporation of which he owns all the stock in exchange for additional shares can not result in gain to an individual under the Sixteenth Amendment, or the Revenue Act of 1918.
On July 1,1919, the decedent was the sole owner of the stock of the Spray Cotton Mills, which was capitalized at $400,000. At about this date he caused the capital stock to be increased to 10,000 shares of $100 par value each. In return for the additional 6,000 shares of stock and $15,000 in cash or cash credits, he caused to be conveyed to the corporation his residence which he valued at $96,000, the Winyah Sanatorium, which he valued at $250,000, and other real estate adjacent to the two properties. The sanatorium paid a rental of $2,000 per month. The evident intent was to convey the residence with a rent-free reservation during the lifetime of the decedent and his wife. The remainder of the property was nonincome producing.
From 1916 to the date of the transfer the only stock sales were to the decedent, who paid par for the last stock acquired by him. The company, from 1916 to 1919, inclusive, shows earnings of $109,163.32, $102,423.69, $75,751.36, and $183,784.13, respectively.
The method of determining the value of stock issued in exchange for property has been considered by the Board in Appeal of William Ziegler, Jr., 1 B. T. A. 186-192, where we held:
The usual method of appraising stock issued for property where there is no evidence of the market value of the stock is to say that the stock is deemed equivalent in value to the property for which it was issued, and hy determining the value of the property one can determine the value of the stock.
In the instant case we are of the opinion that the fair market value of the property transferred was $675,000. Applying the rule laid down in the Ziegler appeal, the fair market value of the Spray Cotton Mills stock exchanged therefor is the same amount. This is the figure used by the respondent and the petitiofiers have offered no proof that convinces us that the fair market value of the stock was in a different amount than that here found. See also Appeal of Napoleon B. Burge, et al, 4 B. T. A. 732.
(2) The second issue involves the question of whether a salary of $1,000 per month payable to the decedent by the Von Ruck Memorial Sanatorium, Inc., for a period from April 1,1919, to July 1,1921, and accrued to his account on the books of that corporation, should be included in the decedent’s taxable net income*
*49 'We have found that a salary of $1,000 a month for a period of one year was voted by the trustees of the corporation, and that for a period of 27 months credits of this amount were made to the deoe-. dent’s account on the books of the corporation. It appears also that the corporation acted through another account as the banker for the decedent. The decedent declined to draw any of the accumulated salary, but there is nothing in the record to show prior to the time that he finally returned the salary that he ever had any intention of relinquishing possession of it. We are of the opinion that of the $27,000 thus credited, $21,000 should be included in taxable income. Appeal of Mattlage, 3 B. T. A. 242. In Appeal of Brander, 3 B. T. A. 231, we said:
Brander (the taxpayer), as president, could at any moment have elected to take the $2,004.49 * * * and no one else could have prevented him. The corporation had sufficient assets to pay him and there was no one to dispute his right to ⅛. * * * During the year he permitted the corporation to change its investments, and he could just as freely have permitted it to pay its salary debt to him. It was not that the corporation would not pay, but rather that he would not receive. This election to give the corporation the temporary use of the amount is an exercise by him of its enjoyment, and this is one of the primary attributes of income. . The Commissioner therefore correctly determined the taxpayer’s income from salary and commission.
The remaining $6,000, being the amount credited to the account in 1921, was returned to the corporation within the year and was not income to the decedent. Appeal of H. B. Hill, 3 B. T. A. 761.
(3) The third question is whether the respondent erred in proposing to tax the decedent, as the sole stockholder, on all the dividends declared and paid by the Spray Cotton Mills for the years 1920 and 1921.
The facts here show an individual possessed of a commanding personality approaching 70 years of age, who attempted on July 28, 1919, to create a trust of 3,460 shares of Spray Cotton Mills stock for the benefit of his foreign relatives, and on August 1 assigned 1.695 shares of Spray Cotton Mills stock to his wife, who executed a similar trust agreement naming her relatives as beneficiaries. The trustee named in the above instruments on the date of the trust agreement gave a receipt for the stock named, but it is clear from the record that the stock was not delivered by the decedent at this time, and that he not only continued to hold the stock but through his dominion over the affairs of the corporation was recognized by the secretary as the sole stockholder. None of the stock mentioned in the trust agreements was delivered to the secretary for cancellation and reissued until April 3, 1921, when it was delivered by the decedent.
On December 6, 1920, 445 shares were transferred of record.
*50 In spite of the trust agreements and the transfer made on December 6, 1920, the dividends of 10 per cent payable January 16, 1920, and of 5 per cent payable February 15, 1921, were both paid directly to the decedent.
Receipts were filed with the corporation, signed by William Schoenheit, the trustee under the above mentioned agreements, but the distribution of the amounts named in the receipts was accomplished by means of funds received from the decedent and in accordance with his instructions.
For the determination of the question of the validity of a gift inter vivos certain definite and well recognized rules have been formulated. Assuming parties legally competent to act, there must be, (1) a definite intention on the part of the donor to make an absolute gift; (2) delivery of the subject matter of the gift; and (3)acceptance by the donee.
In the instant case delivery is lacking and, in addition, the donor during the period under consideration continued to exercise dominion.
As to the 441 shares of stock transferred of record on December 6, 1920, but not delivered until late in 1921, since these transfers were obviously gifts the same rule should govern as stated above. Accordingly, we are of the opinion that as to this issue the respondent’s determination should be sustained.
(4) The fourth issue involves the question of whether or not the respondent erred in adding $200 per month to the decedent’s income in lieu of rent on his residence which was conveyed to the Spray Cotton Mifis on July 1, 1919, from that date through the year 1921. The evident intent of the parties, as shown by the preliminary contracts, was that the decedent and his wife should have the use of this property free from rent during their lifetimes. We have considered this element in arriving at the valuation of $615,000 for the property conveyed, and are accordingly of the opinion that the respondent erred in adding $200 per. month to the decedent’s income for the period subsequent to the transfer.
(5) The fifth issue is whether the gifts of certain shares of the capital stock of the Spray Cotton Mills made by the decedent to relatives of himself and his wife were transfers thereof in contemplation of death.
The Revenue Act of 1921 provides as follows:
Sec. 402. That the value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—
(a) To the extent of the interest therein of the decedent at the time of his death which after his death is subject to the payment of the charges against his estate and the expenses of its administration and is subject to distribution as part of his estate;
[[Image here]]
*51 (c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money’s worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title.
The intention to make the gifts of the stock in question was expressed in the two trust agreements dated July 28, 1919, and August 1, 1919, respectively. The donor .did not relinquish possession of the stock and complete the gift until April 8, 1921. The statute imposes on the plaintiff the duty of showing that gifts made within two years prior to the date of death ,are not made in contemplation of death.
In this case we have an experienced physician, head of a hospital, assisted by trained medical men, in the fall of 1920 calling on a member of his hospital staff for consultation. A diagnosis of myocarditis was made, which the decedent refused to accept until satisfied through personal research on the subject. After he did come to a conclusion, he then sent a synopsis of his medical condition to Dr. Barker of Johns Hopkins, together with tracings of his heart and other information. The diagnosis of myocarditis was confirmed by Dr. Barker. Subsequently, the decedent wrote to Dr. Barker asking for an estimate as to his life expectancy.
It is our opinion that the petitioners have failed to overcome the presumption that these gifts were made in contemplation of death and accordingly the determination of the respondent should be sustained.
(6) The respondent included in the gross estate of the decedent the November 5, 1922, value, as determined by him, of certain shares of capital stock of the Spray Cotton Mills which he found to have been transferred by the decedent prior to his death, holding such transfers to have been made in contemplation of death. The total amount received for the 7,628 shares of stock was $110,060.74. In the original letter of determination, the respondent allowed credits of this amount against the values determined as of the date of death. By his amended answer he alleges that the credits should not have been allowed as a reduction of the value of the property transferred.
On April 3, 1921, 160 shares of stock were transferred to Karl Bishopric in consideration of the payment of $70 per share and the reduction of Bishopric’s contract as secretary with the Spray Cotton *52 Mills. Under this contract, Bishopric received a salary and commissions which in the prior year had brought him a total compensation of about $14,000. In return for the right to purchase 250 shares, of which he actually purchased 160, he submitted to a reduction of one-half in his salary and commissions. We are of the opinion that as to this sale of 160 shares, it was a bona fide transaction for a fair consideration in money or money’s worth.
As to the 1,551 shares sold on various dates at a price of $63.74, which represented the estimated cost to the decedent, we are of the opinion that it was not a bona fide sale for a fair consideration in money or money’s worth and that the petitioners have failed to show that the sale was not made in contemplation of death.
The respondent, by his amended answer, is seeking to increase the deficiency originally made by $110,060.74, which arises by his disallowing the credits from the cash paid for the stock.
The statute requires that the property transferred be included in the gross estate “ to the extent of any interest therein of which the decedent has at any time made a transfer.” Section 302 (i) of the Revenue Act of 1926 contains the provision in respect of a transfer by way of sale that “ there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.”
While there may be some grounds as to the respondent’s argument that the amount received should be added to the value determined as of the date of death, we are of the opinion that it was never the intent of Congress to include in the gross estate an amount in excess of the value at the time of the decedent’s death, and that the change expressed in the 1926 Act should not be construed as a declaration of a new policy.
(7) The seventh issue raised is the value of the common stock of the Spray Cotton Mills at November 5, 1922, the date of the decedent’s death.
The respondent determined a value of $149 per share as of this date. The petitioners are contending that its value is not in excess of $58.72 per share. Evidence was introduced by the petitioners seeking to use 8 times its average earnings as a basis.
The situation is unusual. In 1919 the decedent conveyed real estate, not necessary for the conduct of his business, to the Spray Cotton Mills, which we have determined had a value of $675,000. For a long period of years the decedent was the sole stockholder of the corporation and he allowed its surplus to accumulate in bonds.
*53 An analysis of the net earnings from 1909 to 1918, from 1912 to 1921, and from 1919 to 1921 shows the following average annual earnings per share: $14.89, $18.99, and $17.98, respectively.
The balance sheet as at October 31,1922, within a very few days of the date of the decedent’s death, shows bonds, certificates of deposit and notes in the total amount of $734,342.23. No evidence was introduced as to the value of the mill property. With quick assets of $73.43 per share, real estate of $60 per share and no evidence as to the value of the mill, we are of the opinion that the determination of $149 of the respondent as the value of the stock of the Spray Cotton Mills on the date of decedent’s death should not be disturbed.
(8) The respondent has included the value of the residuary legacy in the gross estate of the decedent. The petitioners contend that it should be deducted under the provisions of section 403(a) (3) of the Revenue Act of 1921, which provides:
Seo. 403. That for the purpose of the tax the value of the net estate shall be determined—
(a) In the case of a resident, by deducting from the value of the gross estate — •
*******
(3) The amount of all bequests, legacies, * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, * ⅜ ⅜ no part of the net earnings of which inures to the benefit of any private stockholder or individual, or to a trustee or trustees exclusively for such religious, charitable, scientific, literary, or educational purposes.
The Yon Ruck Research Laboratory, Inc., the legatee, i,s a non-stock corporation claimed by the petitioners to be a charitable institution. It was organized by the decedent in August, 1918, to operate the Winyah Sanatorium property owned by the Spray Cotton Mills, for which it paid a rental of $24,000 a year. Starting with assets of $6,907.97 donated by the decedent, this nonstock corporation accumulated by July, 1921, a profit of $88,969.68. In July, 1921, the name of this corporation was changed to “ The Von Ruck Research Laboratory, Inc.,” and the laboratory activities, including the manufacture of tubercular vaccine, were continued. The conduct of the sanatorium was transferred to a newly organized stock corporation, the Yon Ruck Memorial Sanatorium, Inc., operated by the decedent for profit. The business was thus segregated into a profit department and a nonprofit department. The two corporations* had the same business manager and the same bookkeeper, and the Research Laboratory occupied space in the sanatorium building. All the tubercular vaccine which the Research Laboratory made was turned over to the Memorial Sanatorium. Prior to the organization of *54 the Research Laboratory, the sanatorium realized losses from uncol-lectible accounts and the treatment of charity patients. After the organization of the Yon Ruck Memorial Sanatorium, Inc., the stock corporation, such items were charged to and paid by the Research Laboratory. With the exception of these payments, the evidence discloses no distribution by the Research Laboratory by way of donations, charitable or noncharitable.
The will provides that in case the majority of the trustees of the Yon Ruck Research Laboratory, Inc., shall determine that the object and purposes for which the corporation was created have been attained, or that further maintenance of the corporation will serve no useful purpose, then that part of the assets of the Research Laboratory contributed by the decedent shall be distributed to his heirs and those of Delia von Ruck, as provided under prior provisions of his will.
We are of the opinion that the Yon Ruck Research Laboratory, Inc., is not such a charitable or scientific organization as to fall within the exemption provided in the statute, and further that where the legatee or trustee is empowered to divert the funds to a use or purpose which would have rendered it not deductible had it been directly so bequeathed or given by the decedent, no deduction should be allowed. Accordingly, the respondent’s determination as to this issue should be sustained.
(9) The ninth and final issue relates to deductions from the gross estate for expenses of administration paid or incurred, and for Federal taxes paid or to be paid by them on the taxable net income of the decedent for all periods prior to his death.
Income taxes have been j>aid by the executors in the amount of $9,614.78, which are properly deductible. Administration expenses, paid or incurred, including the decedent’s note payable to Abbie Moore and the specific exemption of $50,000, are properly deductible from the gross estate, of which amount $95,234.48 was allowed as a deduction in the determination of the respondent.
The parties hereto have agreed that the amount of any deficiency in income taxes for the years 1919, 1920, and 1921, together with interest thereon allowed by law, constitute a proper deduction from the gross estate.
Reviewed by the Board.

Judgment will be entered under Rule 50.